USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT  ____________________ No. 94-1215 UNITED STATES OF AMERICA, Appellee, v. ALFRED M. GABRIELE, Defendant, Appellant.  ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ernest C. Torres, U.S. District Judge] ___________________  ____________________ Selya, Cyr and Boudin Circuit Judges. ______________  ____________________ John A. MacFadyen for appellant. _________________ William C. Brown, Attorney, Department of Justice, with whom _________________ Sheldon Whitehouse, United States Attorney, and Michael E. Davitt, ___________________ __________________ Assistant United States Attorney, were on brief for appellee.  ____________________ August 23, 1995  ____________________ CYR, Circuit Judge. Defendant Alfred Gabriele chal- CYR, Circuit Judge.  ______________ lenges various district court rulings underlying his convictions for participating in a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C.  1962(c), (d) (1991), and for engaging in six monetary transac- tions in criminally derived property, id. 1957. We affirm. ___ I I BACKGROUND BACKGROUND __________ This is the third and final installment in the appel- late proceedings arising out of the extensive money laundering operation headed by Stephen Saccoccia from the mid-1980s until late 1991. The earlier proceedings are reported in United States _____________ v. Saccoccia, 58 F.3d 754 (1st Cir. 1995), and United States v. _________ _____________ Hurley, __ F.3d ___ (1st Cir. 1995) [Nos. 93-1511, 93-1560, 93- ______ 1561, 93-1562, 93-1563, 93-1616, 93-1617, 93-2006, 93-2207, 94- 1388, 94-1507, 94-1508 (1st Cir. July 20, 1995)]. After Gabriele was indicted for alleged participation in the Saccoccia criminal enterprise, he stipulated to the facts established by the govern- ment at the two earlier trials involving Stephen Saccoccia and his codefendants. We relate only the background information material to Gabriele's involvement in the criminal enterprise. The money laundering operation primarily functioned through precious metals companies controlled by Saccoccia and located in Los Angeles, New York, and Rhode Island. Colombian drug dealers transferred huge sums to the Saccoccia organization for laundering. Employing various techniques, such as purchases 2 of gold and cashier's checks, the Saccoccia organization laun- dered the drug monies and funneled laundered funds back to Colombia by circuitous techniques (e.g., multiple wire transfers and interstate transportation). Some of the gold was delivered to Recovery Technologies, Inc. ("RTI"), a precious metals dealer located in Attleboro, Massachusetts, and controlled and operated by Gabriele. The gold was kept in a safe purchased by Saccoccia and installed at RTI with Gabriele's consent. At one point Gabriele prophetically observed in relation to the gold deliver- ies: "Steve [Saccoccia] is going to put us all in jail some day." In the summer of 1991, after learning that two of his Rhode Island companies were under FBI video surveillance, Sac- coccia pointed out the concealed surveillance cameras to Gab- riele. Shortly thereafter, Saccoccia announced his intention to acquire RTI from Gabriele and hired Gabriele as his employee. Saccoccia then began to divert to RTI the cash and gold shipments which could no longer be delivered undetected to the two Sac- coccia companies. The deliveries to RTI were monitored by Saccoccia employees. Among the persons at RTI, Gabriele alone knew about, and participated in counting, the cash and gold shipments from Saccoccia. The shipments to RTI were recorded by Gabriele in coded language. The coded records were kept in the desk in 3 Gabriele's private office, separate from all other RTI records.1 During this period, Gabriele again voiced concern that Saccoccia "is going to put us all in jail."  From time to time Saccoccia instructed Gabriele to transfer the large sums of cash kept in the RTI safe. On various occasions Gabriele wired funds to designated banks at Saccoccia's direction or turned over funds directly to Saccoccia couriers who had been told to leave cash amounts for Gabriele. Saccoccia and Gabriele discussed their ongoing cash transactions in a coded conversation intercepted by the FBI in October 1991.  In due course, Gabriele was indicted on a RICO conspir- acy charge, along with Saccoccia and others, and separately charged with engaging in eight monetary transactions involving criminally derived property. A jury convicted him of RICO conspiracy and six monetary transaction charges.2  II II  ____________________ 1The secret records kept by Gabriele related also to the so- called Saccoccia "pool account" at RTI. Normally, RTI would sell gold for a client, place the proceeds in the pool account, and immediately wire the funds directly to the client. The secret pool account records revealed, however, that the proceeds due Saccoccia remained in RTI's bank account for much longer periods of time, awaiting Saccoccia's instructions to wire the funds  frequently to third parties. 2At trial, Gabriele contended that Saccoccia, a long-time RTI client, had been allowed to keep cash in the RTI safe because the security systems at Saccoccia's Rhode Island companies were temporarily off-line, and that the large amounts of cash he handled for Saccoccia were not uncommon in the precious metals industry. He maintained that the intercepted conversations were inconclusive and that the inculpatory testimony from other Saccoccia employees was unreliable. 4 DISCUSSION DISCUSSION __________ Gabriele takes the district court to task on several rulings, which we discuss in turn.  5 A. Section 1957 A. Section 1957 ____________ 1. Mens Rea 1. Mens Rea ________ First, he claims that the mens rea element under ____ ___ section 1957 is unconstitutionally vague, see, e.g., Kolender v. ___ ____ ________ Lawson, 461 U.S. 352, 357 (1983), and that the district court ______ therefore erred in denying his pretrial motion to dismiss the section 1957 charges. The crux of the argument is that section 1957 is a rather novel statute, in that it criminalizes conduct by a person once removed from that of the person who generated the criminally derived property. Thus, he argues, the proscribed conduct is not likely to appear unlawful to an ordinary citizen. Second, he contends that section 1957 is unconstitu- tional on its face, in that it chills legitimate business trans- actions because a prudent business person could never be sure how many suspicion-arousing "red flags" would be enough to lead a jury to infer that the person "knew" that a client or customer was engaged in criminal activity. Alternatively he suggests that persons engaged in honest business dealings would be forced to rely on racial or ethnic stereotyping, as by refusing to do business with "known" criminals.  Section 1957(a) prohibits "knowingly engag[ing] in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity . . . ." 18 U.S.C. 1957(a). "Criminally derived property" is "any property constituting, or derived from, pro- 6 ceeds obtained from a criminal offense." Id. 1957(f)(2). A ___ defendant may not be convicted under section 1957(a) unless he knew that the transaction involved "criminally derived" property, id. 1957(c), but he need not have known that the subject ___ property was derived from "specified unlawful activity," id. The ___ denial of a pretrial motion to dismiss criminal charges is reviewed de novo. See United States v. Aguilar-Aranceta, 957 __ ____ ___ _____________ ________________ F.2d 18, 21 (1st Cir.), cert. denied, 113 S. Ct. 105 (1992).  _____ ______ First, given the prominent "red flags" that signaled the criminal nature of the Saccoccia money laundering operation to Gabriele (e.g., knowledge of government surveillance; eva- sionary tactics; large volumes of secreted cash), as well as the strong evidence of Gabriele's mens rea ("some day Stephen Sac- ____ ___ coccia is going to put us all in jail"), the instant constitu- tional challenge to the "knowledge" requirement under section 1987 has the ring of desperation. See United States v. Baker, 19 ___ _____________ _____ F.3d 605, 614 (11th Cir. 1994) (rejecting comparable as-applied challenge to 1957). Second, the facial challenge to the statute is without persuasive force. Section 1957 is but another in a substantial line of federal criminal statutes whose only mens rea requirement ____ ___ is "knowledge" of the prior criminal conduct that tainted the property involved in the proscribed activity. See, e.g., 18 ___ ____ U.S.C. 2312 (prohibiting interstate transportation of automo- biles "knowing the same to be stolen"); 2313 (same, for receipt of such automobiles); 2314 (criminalizing interstate 7 transportation of goods "knowing the same to have been stolen, converted, or taken by fraud"). Thus, Gabriele's policy argument reduces to an attempt to second-guess the congressional decision to criminalize a particular type of "knowing" conduct.  Gabriele further claims that the district court erred in rejecting proposed jury instructions defining the section 1957 "knowledge" element with greater precision.3 As he did not adequately renew his objections to the charge prior to the time the jury retired to deliberate, see Fed. R. Crim. P. 30, we ___ review for plain error. See United States v. O'Connor, 28 F.3d ___ _____________ ________ 218, 220-21 (1st Cir. 1994).4  The district court carefully instructed the jury that Gabriele could not be convicted unless he "knew that the money or property involved in [the particular] monetary transaction was obtained from the proceeds of some criminal offense," and that the "knowledge" element was not met merely by a finding that  ____________________ 3Gabriele requested instructions (i) defining "knowing" as a "clear and certain perception of fact or truth," not a mere suspicion, Request No. 18; (ii) that he had no duty to investi- gate the legality of the Saccoccia enterprise, Request No. 19; and (iii) that he could not be convicted unless the jury found that he knew it was a criminal offense to engage in monetary transactions in criminally derived property, Request No. 18A (citing Cheek v. United States, 498 U.S. 192 (1991)).  _____ _____________ 4Gabriele did not object to the definition of "knowing," following the jury charge. See supra note 3. Although he ___ _____ clearly delineated the grounds for objecting to numerous other jury instructions, see infra Section II.B.2, he simply renewed ___ _____ his objections to Requests 18A and 19 by reference. See O'Con- ___ ______ nor, 28 F.3d at 221 (under Fed. R. Crim. P. 30, party must state ___ _____ distinctly the grounds for objecting, and may not rely on previ- ous written articulation of grounds). 8 Gabriele "might have known," "should have known," or "could have known." Like terms denoting other mens rea elements, "knowledge" ____ ___ is not readily susceptible to a more precise definition than is derived from the connotation suggested by the term itself. Our review confirms that the district court instruction in all respects delineated the appropriate "knowledge" element for application by the jury. See United States v. Noone, 913 F.2d ___ _____________ _____ 20, 30 (1st Cir. 1990) (refusal to give requested instruction not reversible error if instruction given was substantially correct and substantially covered defendant's request), cert. denied, 500 _____ ______ U.S. 906 (1991).5 Finally, Gabriele contends that the jury instruction on "willful blindness" was error.6 Since the government adduced no evidence that Gabriele had engaged in any particular conduct for the purpose of precluding his acquisition of actual knowledge that Saccoccia was engaged in unlawful activities, Gabriele argues that the "willful blindness" instruction necessarily  ____________________ 5Since the 1957 mens rea requirement includes no "wilful- ____ ___ ness" element, a Cheek instruction, see supra note 3, would have _____ ___ _____ been improper as a matter of law. See United States v. Brandon, ___ _____________ _______ 17 F.3d 409, 448 (1st Cir.) (noting that requested instruction which includes an incorrect statement of the law should not be given), cert. denied, 115 S. Ct. 80 (1994).  _____ ______ 6The instruction stated, inter alia: "In deciding whether a _____ ____ defendant acted knowingly, you may infer that the Defendant had knowledge of a fact if you find that [he] deliberately closed his eyes to a fact that otherwise would have been obvious to him." Further, the court cautioned the jury: "It's up to you to decide whether . . . this Defendant deliberately closed his eyes to a fact and, if so, what inference should be drawn. It's important, ____ _________ ______ __ _____ however, to bear in mind that mere negligence or mistake in failing to learn a fact is not sufficient." (Emphasis added.)  9 suggested that the jury could convict if it found that he "should have known" that the gold and cash he received from Saccoccia derived from criminal activity. Once again, we review for plain error.7  A willful blindness instruction is warranted if (1) the defendant claims lack of knowledge; (2) the evidence would support an inference that the defendant consciously engaged in a course of deliberate ignorance; and (3) the proposed instruction, as a whole, could not lead the jury to conclude that an inference of knowledge was mandatory. See United States v. Brandon, 17 ___ _____________ _______ F.2d 409, 452 (1st Cir.), cert. denied, 115 S. Ct. 80 (1994); _____ ______ United States v. Richardson, 14 F.3d 666, 671 (1st Cir. 1994). ______________ __________ Gabriele concedes that the first and third elements were met but argues that the instruction was improper because the government failed to prove that though confronted with various "red flags,"  ____________________ 7The following colloquy occurred at side-bar immediately after the jury charge: [Defense counsel]: I specifically object to . . . the willful blindness, so-called con- scious avoidance instruction. I incorporate by reference all of the argument that I made in support of that objection that was made at the conference, at the charge conference. Should I put them on the record or incorpo- rate them by reference? Court: Your arguments? You mean as far as incorporated that by reference? [Defense counsel]: Thank you. We have held that counsel must comply with the requirements of Rule 30 unless the district court expressly forbids it. See ___ O'Connor, 28 F.3d at 221.  ________ 10 he nonetheless said "I don't want to know what they mean." He is mistaken, however. See, e.g., id. at 671 (finding no plain error ___ ____ ___ in instructing jury on "willful blindness" where evidence indi- cated that defendant had been presented with a succession of "flags of suspicion" in business dealings). There was no plain error in the district court instruction that "knowledge" could be inferred if the jury were to find that Gabriele consciously avoided the import of the conspicuous "red flags" involved here (e.g., government surveillance, large stores of cash, use of coded language).8  2. Motion for Judgment of Acquittal 2. Motion for Judgment of Acquittal ________________________________ The pre-1992 version of section 1957(f)(1) defined "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument . . . by, through or to a finan- cial institution (as defined in section 5312 of title 31) . . . ." 18 U.S.C. 1957(f)(1) (1988).9 Gabriele contends that the  ____________________ 8To the extent that Gabriele suggests that a willful blind- ness instruction was unwarranted because the government presented direct evidence of actual knowledge (viz., Gabriele's repeated ______ statements about "jail"), we note that the jury was free to discredit the more direct evidence, yet find the requisite "knowledge" based solely on a reasonable inference of willful blindness.  9RTI is a "financial institution" for 1957(f)(1) purposes. See 31 U.S.C. 5312(a)(2)(N) (term includes "a dealer in pre- ___ cious metals"). Gabriele's reply brief argues that these cash shipments were made "to him at RTI," not to RTI. As Gabriele did not make this argument, either in the district court or in his opening brief on appeal, it is deemed waived. See United States ___ _____________ v. De Masi, 40 F.3d 1306, 1312 (1st Cir. 1994) (issues not raised _______ in trial court cannot be raised on appeal); id. at 1318 (issues ___ initially raised in appellate reply brief deemed waived).  11 government's evidence merely showed as to five of the six counts of conviction under section 1957 that he received cash ________ shipments from Saccoccia, counted and held them for safekeeping, ____ then returned them through Saccoccia's emissaries. Although mere receiving and holding comes within the broader definition of "transaction" found in the money laundering statute, see 18 _____ __________ _______ ___ U.S.C. 1956(c)(3) ("transaction" includes "delivery by, ________ through, or to a financial institution") (emphasis added), __ Gabriele argues that the language of section 1957(f)(1) clearly contemplates something more; namely, evidence that the defendant ____ in some manner further facilitated the laundering process itself; for example, by commingling a cash "deposit" with the financial institution's own funds, altering the form of the property deposited (e.g., by purchasing gold or a cashier's check), or transferring the deposit, or its proceeds, to third parties, as by wire transfer.  The denial of a Rule 29 motion for judgment of acquit- tal is reviewed de novo to determine whether any rational fact- __ ____ finder could have found that the evidence presented at trial, together with all reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt. See United States ___ _____________ v. Hernandez, 995 F.2d 307, 311 (1st Cir.), cert. denied, 114 S. _________ _____ ______ Ct. 407 (1993). Gabriele cites neither legislative history nor authori- ty for the contention that the statutory term "deposit" was used 12 in its specialized sense so as to reach only bank deposits.10 The plain language of section 1957(f)(1) explicitly criminalizes the knowing acceptance of a "transfer . . . to" a "financial ________ institution," such as RTI, see 31 U.S.C. 5312, knowing that the ___ transfer involved criminally derived property. See United States ___ _____________ v. Bohai Trading Co., 45 F.3d 577, 581 (1st Cir. 1995). We see _________________ no significance in the fact that Congress chose to insert in section 1956(c)(3) an illustrative list of the types of covered ____________ "transfers," id. 1956(c)(3) ("the term 'transaction' includes . ___ ________ . . a transfer . . . and with respect to a financial institution includes . . .") (emphasis added), then chose not to repeat that ________ list in the non-illustrative definition appearing in section 1957(f)(1) ("the term `monetary transaction' means the deposit, _____ withdrawal, or transfer . . .") (emphasis added).  Further, given its particular intention to target money laundering in these companion statutes, we see no basis for the conjecture that section 1957(f)(1) was intended to proscribe only the conduct of those transferees who actually "launder" the cash or other property deposited (i.e., effect an alteration in its form). The evidence in this case clearly established that Saccoccia arranged to "transfer" these large cash sums for the very purpose of having RTI hold the cash safe from the recent- ly discovered government surveillance at Saccoccia's two Rhode  ____________________ 10Not only is there no indication that the term "deposit" was used in this specialized sense, but it is significant, we think, that non-conventional financial institutions, such as precious metals dealers including RTI were expressly covered by the statute.  13 Island companies for eventual laundering in the normal course. We think this evidence demonstrated "deposits" or "transfers" sufficient to satisfy the statute. For these reasons, the motion for judgment of acquittal was properly denied.  14 B. RICO Conspiracy B. RICO Conspiracy _______________ 1. The "Conduct or Participate" Instruction 1. The "Conduct or Participate" Instruction ________________________________________ Section 1962(c) makes it a criminal offense "for any person employed by or associated with any enterprise [affecting interstate commerce] to conduct or participate, directly or ___________ ________ __ indirectly, in the conduct of such enterprise's affairs through a __________ __ ___ _______ __ pattern of racketeering activity." 18 U.S.C. 1962(c) (emphasis added). Gabriele argues that it was error to instruct the jury that it need not find that he "directed" the Saccoccia enterprise since "an enterprise is operated not just by upper management but also by lower rung participants who act on the direction of upper management." See Reves v. Ernst & Young, 113 S. Ct. 1163, 1170, ___ _____ ______________ 1172 (1993) (independent accounting firm must be shown to have "participated" in, or played "some part in directing," the enterprise). Although Gabriele preserved the present claim with a timely Rule 30 objection, it is foreclosed by recent circuit precedent. See Hurley, __ F.3d at ___ [slip. op. at 12-13] ___ ______ (finding no plain error, noting that Reves has no relevance to _____ defendants who were "employees," as distinguished from indepen- dent or outside participants like the accounting firm in Reves) _____ (citing United States v. Oreto, 37 F.3d 739, 750 (1st Cir. 1994), _____________ _____ cert. denied, 115 S. Ct. 1161 (1995)).  _____ ______ The government introduced ample evidence unchal- lenged on appeal that Gabriele, unlike the accounting firm in Reves, was not an independent "outsider" but a full-fledged _____ "employee" of the Saccoccia enterprise, as evidenced by Sac- 15 coccia's anticipated "purchase" of RTI from Gabriele and his instructions to underlings to leave cash for Gabriele. Even employees not engaged in directing the operations of the RICO _________ enterprise are criminally liable if they are "plainly integral to carrying [it] out." See id. The district court gave precisely ___ ___ this instruction. See Reves, 113 S. Ct. at 1173.11 ___ _____ 2. Other RICO-Related Instructions  2. Other RICO-Related Instructions  _______________________________ Gabriele contends that the district court declined to give five other jury instructions which were essential to enable the jury to differentiate section 1957 from RICO conspiracy  "two offenses occupying opposite ends of the white collar [crime] spectrum." Brief for Appellant at 46. Although this challenge was duly preserved as well, we will reverse only if the requested jury instructions represented substantially correct statements of the applicable law not substantially covered in the instructions given, and their omission seriously undermined Gabriele's ability to mount a defense. See Brandon, 17 F.3d at 448; see also Noone, ___ _______ ___ ____ _____ 913 F.2d at 30. We discern no error. Request No. 6 would have precluded conviction unless the jury found that RTI was part of the RICO enterprise, on the ___ theory that Gabriele could not have "participated" unless he "directed" a component part of the enterprise. Thus, it was predicated on an incorrect view of the law. See supra Section ___ _____  ____________________ 11To the extent Gabriele is intimating that Reves did not _____ determine whether an employee's contribution to the enterprise may be so insignificant as not to constitute "participation," id. ___ at 1173 n.9, we need note only that Gabriele's participation was by no means insignificant.  16 II.B.1. Whether or not RTI was part of the RICO enterprise, there was ample evidence from which the jury could find that Gabriele "participated" as a Saccoccia employee who was "plainly integral to carrying out" the enterprise even though he did not "direct" its operations. Id. ___ Request No. 9 proposed to instruct the jury that Gabriele's commission of two predicate acts, without more, would _______ ____ not establish his agreement to "participate" in the RICO enter- prise. Request No. 12 would have precluded conviction unless the jury found that Gabriele "knew of the conspiracy's essential features, general scope, and overall goals." These requests were substantially covered by the final charge, which repeatedly reminded the jury that acquittal was required unless it found that Gabriele "under[stood] the unlawful nature of the plan" and entered into a "mutual agreement" to accomplish "some unlawful purpose." Request No. 16 stated that "a person who may have furnished goods, money, or services to another person who he knows is or will be engaged in criminal activity and that these goods or services may be used in that activity does not by furnishing such goods, money or services necessarily become a member of the conspiracy." See Direct Sales Co. v. United ___ _________________ ______ States, 319 U.S. 703 (1943). The truism underlying the requested ______ instruction is that the seller's mere knowledge of the existence of a conspiracy is not in itself sufficient to convict him as a conspirator; the seller must also have intended that the sale 17 promote the unlawful goals of the conspiracy. See, e.g., United ___ ____ ______ States v. Garcia-Rosa, 876 F.2d 209, 216 (1st Cir. 1989), cert. ______ ___________ _____ denied, 493 U.S. 1030, cert. granted and vacated on other ______ _____ _______ ___ _______ __ _____ grounds, 498 U.S. 954 (1990). Nonetheless, as we have noted, the _______ Direct Sales Co. instruction normally is not essential if the _________________ trial court advises the jury that the defendant cannot be con- victed absent a finding that he joined the conspiracy with intent to further its unlawful purposes. Brandon, 17 F.3d at 448-49. _______ The jury charge repeatedly brought home the latter point.  Request No. 20 stated a "theory of the defense," in Gabriele's words; namely "that the Government has failed to prove . . . that the defendant agreed to participate in the [conspira- cy] . . . or that he had knowledge that his transaction may have involved criminally derived property." As a theory of the defense, the request overreached by attempting to coopt the court. To the extent the request purposed a "reasonable doubt" standard, it was surplusage, since the charge delineated the requisite elements under section 1962(c) and (d), and repeatedly instructed the jury that the government had the burden of proving each element beyond a reasonable doubt. See United States v. ___ _____________ Long, 977 F.2d 1264, 1272 (8th Cir. 1992) (where lack of knowl- ____ edge is defense, jury instructions on conspiracy, intent, and specific intent adequately covered "theory of the defense").12 There was no instructional error relating to the RICO conspiracy.  ____________________ 12Since there was no instructional error, Gabriele's "cumu- lative error" claim goes nowhere.  18 C. The Motion for Mistrial and the C. The Motion for Mistrial and the _______________________________ Privilege Against Self-Incrimination  Privilege Against Self-Incrimination  ____________________________________ Finally, Gabriele argues that the district court violated his Fifth Amendment privilege against self-incrimination by stating to the jury, following the close of the government's case: "You may return to the jury room for your afternoon recess and we will hear the rest of the story." (Emphasis added.) See ___ ____ __ ___ _____ ___ Griffin v. California, 380 U.S. 609 (1965); United States v. _______ __________ ______________ Lavoie, 721 F.2d 407, 410 (1st Cir. 1983), cert. denied, 465 U.S. ______ _____ ______ 1069 (1984). Gabriele insists that the jury necessarily drew the improper inference that he would take the stand to "tell his story," whereas in fact he rightfully elected not to testify. He adds that the district court instruction given in lieu of his request for a mistrial was inadequate, because the court merely noted that a defendant bears no burden of proof in a criminal case, while failing to emphasize that no adverse inference may be drawn from a defendant's decision to exercise his constitutional right not to testify at trial. Whether a statement in the presence of the jury in- fringed upon the privilege against self-incrimination is a question normally reviewed de novo. See United States v. Glantz, __ ____ ___ _____________ ______ 810 F.2d 316, 320 n.2 (1st Cir.), cert. denied, 482 U.S. 929 _____ ______ (1987). On the other hand, the denial of a motion for mistrial is reviewed for abuse of discretion. See United States v. ___ ______________ Rullan-Rivera, ___ F.3d ___, ___ (1st Cir. 1995) [No. 94-1890, _____________ 1995 U.S. App. LEXIS 18434, at *4 (1st Cir. July 21, 1995)]. As 19 Gabriele interposed no timely objection,13 however, we review only for plain error. See Fed. R. Crim. P. 52(b). In all ___ events, we find neither plain error nor abuse of discretion in the denial of the motion for mistrial.  First, the colloquial expression utilized by the trial judge ("we will hear the rest of the story") plainly was intended merely to inform the jury that though the government's case had been completed, the defense as distinguished from the defen- _______ dant's testimony had yet to be heard. Although appellate review is plenary, Glantz, 810 F.2d at 320 n. 2, we think it ______ would be imprudent to attribute the more ominous import now urged by Gabriele on appeal, in light of the view apparently taken by the trial court and counsel at the time. See United States v. ___ _____________ Robinson, 485 U.S. 25, 30-31 (1988) (noting, in context of ________ challenge to ambiguous statements of prosecutor arguably constituting improper comment on defendant's exercise of privi- lege against self-incrimination "we do not think that an  ____________________ 13The government argues that the challenged comment must be viewed as innocuous because even the defense failed to perceive ________ the statement as an infringement upon Gabriele's privilege against self-incrimination, as evidenced by the fact that the defense objected solely on the ground that the jury might con- strue the statement as shifting the burden of proof to the defense. Gabriele responds that he delayed his Fifth Amendment objection until the defense rested, because he had not yet decided whether to take the stand.  We think the delay in interposing an objection on the Fifth Amendment ground effected a waiver. Whether or not Gabriele ever took the stand, the district court's statement (as construed by Gabriele) could have had a coercive effect upon his decision whether to testify. Thus, had the alleged Fifth Amendment infringement been perceived, it seems clear that it would have been more advantageous to raise it before that decision had to be ______ made.  20 appellate court may substitute its reading . . . for that of the trial court and counsel"). Thus, we think it would amount to impermissible conjecture to conclude that the jury understood the trial judge's reference to the "rest of the story" as "'a comment on the failure of the accused to testify.'" See Glantz, 810 F.2d ___ ______ at 322 (noting that the challenged comment must be "manifestly intended or . . . of such character that the jury would naturally _________ and necessarily take it to be a comment on the failure of the ___________ accused to testify") (emphasis added) (citation omitted). It would be particularly problematic to do so here, since the defense clearly signaled that it perceived the statement to be objectionable at the time only because the jury might take it as a license to shift the burden of proof. We believe, therefore, that an appellate court would be overreaching were it to attrib- ute to the jury the more ominous interpretation now proposed by the defense. See Robinson, 485 U.S. at 30.  ___ ________ Second, even assuming the jury so interpreted the judge's statement, the preliminary instructions emphatically charged that "a defendant has a right to remain silent . . . [and] you should understand that if he does not [take the witness stand], you should not draw any inferences from that." The final charge once again stated that "the fact that a defendant has, in this case, . . . chosen to exercise [the privilege against self- incrimination] should not be considered in any way by you as proving anything one way or the other." Thus, we see no sound basis for departing from the customary presumption that juries 21 follow their instructions. See Rullan-Rivera, ___ F.3d at ___ ___ _____________ [No. 94-1890, 1995 U.S. App. LEXIS 18434, at *5 (1st Cir. July 21, 1995)]. Accordingly, the district court did not abuse its discretion in denying the motion for mistrial. The district court judgment is affirmed. ___ ________ _____ ________ __ ________ 22